FILED

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
VIRGINIA** 2018 JUN 15 A 10: 14

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

---

Glenn Myer, Clinical Pharmacist

Plaintiff,

v.

Governor Ralph Northam
Sharon Bulova
Ryan K. Logan
Michael I. Elliott
Sheila K. W. Elliot
Rafael Saenz
Cynthia Warriner
Jody H. Allen
Melvin L Boone, sr
James L. Jenkins jr
Rebecca Thornbury
Allen R. Jones jr
Sarah Schmidt
Susan Szasz Palmer
Elizabeth Locke
Arena L. Dailey
Tracey Alder
Mira Mariano
Jay Douglas
Huong Vu
Brenda Krohn
Jodi Power
Robin Hills
Paula Saxby
Stephanie Willinger
Linda Kleiner
Charlotte Ridout
Fairfax County
Prosperity Pharmacy

Case Number: 1:18-cv-723

CIVIL RIGHTS COMPLAINT:

Violation of 14 Amendment of the
Constitution of the United States

American Disabilities Act
U.S.C 42 § 12101

HIPPA Violations
Title 45 of the Code of Federal
Regulations

18 U.S. Code Chapter 47 - FRAUD
and False Statements

ERSIA, 29 U.S.C. ch. 18

H.R.5835 - Omnibus Budget
Reconciliation Act of 1990

Torture 18 U.S. Code § 2340A

Violations of 1st Amendment

Reconciliation Act of 1990

Unprofessional Conduct by
Pharmacist at Inova
Physical Therapist at Bodies
in Motion
Pharmacist at Walgreens
Walgreen Pharmacies

Violations of Fiduciary
Duty by most defendants

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
VIRGINIA

Glenn Myott, Clinical Pharmacist

Plaintiff,

v.

Governor Ralph Northam
Sharon Sulove
Ryan K. Logan
Michael I. Elliott
Sheila K. W. Elliot
Rafael Saenz
Cynthia Warriner
Jody H. Allen
Melvin I. Boney, sr
James L. Jenkins jr
Rebecca Thornbury
Allen R. Jones jr
Sarah Schmidt
Susan Kaas Painter
Elizabeth Loxx
Arana L. Dosey
Tracey Alder
Mira Mariano
Jay Douglas
Huong Vu
Brenda Krohn
Jodi Power
Robin Hills
Paula Saxby
Stephanie Willinger
Linda Kleinor
Charlotte Pidduir
Fairfax County
Prosperity Pharmacy

Case Number: _____

CIVIL RIGHTS COMPLAINT

Violation of 14 Amendment of the
Constitution of the United States.

American Disabilities Act
U.S.C. 42 ...

HIPPA Violations
Title 45 of the Code of Federal
Regulations

18 U.S. Code Chapter 47 - FRAUD
and False Statements

ERISA, 29 U.S.C. ch 1

H. R. 5835 - Omnibus Budget
Reconciliation Act of 1990

Torture 18 U.S. Code § 2340A

Violations of 1st Amendment

Reconciliation Act of 1990

Unprofessional Conduct by
Pharmacist at Inova,
Physical Therapist at bodies
in Motin
Pharmacist at Walgreens,
Walgreen Pharmacies

Violations of Fiduciary
Duty by most defendants

Pharmacist of Prosperity Pharmacy
John Does Pharmacist and technicians at
Prosperity Pharmacy
Inova Pharmacy
Jane Doe, Pharmacy Director
Several Pharmacists at Inova
Walgreen Pharmacies
Bodies in Motion
Michael Mastrostefano, Bodies in Motion
Aetna Insurance
Fairfax Adult Detention Center Employees
Jane and Joe Does Nurses
Haas Doe Medical Records at ADC
Stacie Kincaid
Omar "The Butcher" Mercedes

All defendants are being sued professionally
And personally

_____

## INJUNCTIVE RELIEF FROM VIRGINIA ADMINISTRATIVE BODIES: PHARMACY BOARD, PHYSICAL THERAPY BOARD, NURSING BOARD AND AETNA INSURANCE BY AN EX-PARTE YOUNG LAWSUIT BY THE PLAINTIFF

NOW, comes Glenn Myer, The Plaintiff Pro Se, 2251 Pimmit Dr. #732, Falls

Church, VA 22043 requesting that this court IMMEDIATELY issue an injunction against

the Virginia Pharmacy Board located at: Perimeter Center, 9960 Mayland Drive, Suite

300, Henrico Virginia 23233, Virginia Physical Therapy Board located at: Perimeter

Center, 9960 Mayland Drive, Suite 300, Henrico, VA 23233, Virginia Nursing Board

located at: Perimeter Center, 9960 Maryland Drive, Suite 300, Henrico, VA 23233.

Bodies in Motion and Michael Mastrostefano located at: 100 E. Jefferson St, Falls

2

Pharmacist of Prosperity Pharmacy
John Does Pharmacist and technicians at
Prosperity Pharmacy
Inova Pharmacy
Jane Doe, Pharmacy Director
Several Pharmacists at Inova
Walgreen Pharmacies
Bodies in Motion
Michael Mastrostefano, Bodies in Motion
Aetna Insurance
Fairfax Adult Detention Center Employees
Jane and Joe Doe Nurses
Head Doe Medical Records at ADC
Stacie Kincaid
Omar "The Butcher" Mercedes

All defendants are being sued professionally
And personally

## INJUNCTIVE RELIEF FROM VIRGINIA ADMINISTRATIVE BODIES: PHARMACY BOARD, PHYSICAL THERAPY BOARD, NURSING BOARD AND AETNA INSURANCE BY AN EX PARTE YOUNG LAWSUIT BY THE PLAINTIFF

NOW, comes Glenn Myer The Plaintiff Pro Se, 2251 Pimmit Dr. #732, Falls Church, VA 22043 requesting that this court IMMEDIATELY issue an injunction against the Virginia Pharmacy Board located at: Perimeter Center 9960 Mayland Drive, Suite 300, Henrico Virginia 23233, Virginia Physical Therapy Board located at: Perimeter Center, 9960 Mayland Drive, Suite 300, Henrico, VA 23233, Virginia Nursing Board located at: Perimeter Center 9960 Mayland Drive, Suite 300, Henrico VA 23233, Bodies in Motion and Michael Mastrostefano located at: 100 E. Jefferson St, Falls

Church, VA 22046, Prosperity Pharmacy and John Does at: 8644 Sudley Road, Suite 120, Manassas, VA 20110, AETNA Insurance, Aetna Inc., 151 Farmington Ave, Hartford, CT 06156, Fairfax County Adult Detention Center at 10520 Judicial Drive, Fairfax, VA 22030 to shutdown the operation of these administrative and companies due to gross violations of federal laws and severe breach of fiduciary duty that has imperiled thousands of American Citizens lives.  The Plaintiff also requests the taking over of the insurance administration from AETNA concerning The Plaintiff's insurance coverage so ERISA and Federal Civil Rights will be adhered to.  The Plaintiff has been subjected to various violations of Federal Laws, Constitutional Rights Violations, Insurance Fraud, Torture because the Confederate State of Virginia has waged war against the Constitution of the United States and the Citizens of Virginia.  The Confederate State of Virginia prides itself on supporting business and income over the rights of American Citizens.  Now comes the time when The Plaintiff requests that THIS COURT finally decides to uphold the RIGHTS guaranteed by the Constitution and protect the Citizens of America and force the Confederate State of comply with the ideas and laws of America!

# **HISTORY**

1. In May 2014, The Plaintiff moved to Virginia as an American Citizen and upon landing in Virginia, The Plaintiff realized that Virginia was no longer one of the States of America, but rather a continuation of the Civil War and Continue to fight the Civil

3

Church, VA 22046, Prosperity Pharmacy and John Does at 6514 Sudley Road, Suite 120, Manassas, VA 20110, AETNA Insurance, Aetna Inc., 151 Farmington Ave, Hartford, CT 06156, Fairfax County Adult Detention Center at 10520 Judicial Drive, Fairfax, VA 22030 to shutdown the operation of these administrative and companies due to gross violations of federal laws and severe breach of fiduciary duty that has imperiled thousands of American Citizens lives. The Plaintiff also requests the taking over of the insurance administration from AETNA concerning The Plaintiff's insurance coverage so ERISA and Federal Civil Rights will be adhered to. The Plaintiff has been subjected to various violations of Federal Laws, Constitutional Rights Violations, Insurance Fraud, Torture because the Confederate State of Virginia has waged war against the Constitution of the United States and the Citizens of Virginia. The Confederate State of Virginia prides itself on supporting business and income over the rights of American Citizens. Now comes the time when The Plaintiff requests that This COURT finally decides to uphold the RIGHTS guaranteed by the Constitution and protect the Citizens of America and force the Confederate State of comply with the ideas and laws of America.

## HISTORY

In May 2016, The Plaintiff moved to Virginia as an American [illegible]

War.  Crime is rampant in the Confederate State, laws are written solely for the protection of the Wealthy and Business and F**K the Citizens.

2.  CVS and Walgreen Pharmacies are run with the only Interest of the Pharmacy and no regard or protection of the Patient.  The way the Board of Pharmacy has positioned the law, there are no regulations that The Plaintiff can read on the internet that protects the patients, which is the only directive of a Pharmacy Board.

3.  HIPPA, OBRA 90, Insurance Fraud, Disgraceful Professional Conduct are the normal behavior with many companies in The Confederate State of Virginia.

4.  Being a Clinical Pharmacist, The Plaintiff has spoken to the Pharmacy Board on numerous occasions concerning HIPPA, Professional Unprofessional Conduct concerning CVS Pharmacist, Walgreen Pharmacist and Inova Pharmacy.  Not one complaint ever came back to The Plaintiff with administrative action.

5.  The Plaintiff was denied to used the Walgreen Rest Room where The Plaintiff is permanently disabled.  The Plaintiff contacted the enforcement division and nothing ever came back to the Plaintiff.

6.  The Plaintiff contacted the HIPPA Violations by CVS Pharmacy on Nutley Street in Fairfax, VA where the Pharmacist lied to The Plaintiff about ordering the medication, Methadone, which was never ordered.  Pharmacy Board never did anything about this unprofessional conduct

7.  The Plaintiff contacted the Pharmacy Board concerning the conduct of Inova Pharmacy in November 2017.  The Plaintiff was diagnosed with Oral Squamous Cell Carcinoma and due to a Spiral Fracture of his left humerus.  The problem came in Pre-Op when the Triage Nurse informed the plaintiff that Ibuprofen that he was

4

taking for pain must be stopped. This caused extreme pain for The Plaintiff. Upon calling his physician, the physician directed to call the pharmacy.

8. The pharmacist declared, "I am not qualified to answer that questions?" Upon calling the Clinical Pharmacist who's job is to answer those questions, this reply was silence. After 10 surgeries at Inova for the cancer, not once did the in house pharmacy return phone calls. The Plaintiff went to the in-patient pharmacy and was not only rebuffed by the pharmacist as The Plaintiff does not have the legal right to talk to a pharmacist.

9. This provision of the Chapter 33 of Title 54.1 of the Code of Virginia, § 54.1-3319. Counseling, E. This section shall not apply to any drug dispensed to an inpatient of a hospital or nursing home, except to the extent required by regulations promulgated by the federal Health Care Financing Administration implementing 42 U. S. C. § 1396r-8 (g) (2) (A).

10. This provision now wages __*WAR*__ against the Untied States of America. When reviewing the E. This section shall not apply to any drug dispensed to an inpatient of a hospital or nursing home, except to the extent required by regulations promulgated by the federal Health Care Financing Administration implementing 42 U. S. C. § 1396r-8 (g) (2) (A).

11. The OBRA-90 ProDUR language requires state Medicaid provider pharmacists to review Medicaid recipients' entire drug profile before filling their prescription(s). The ProDur is intended to detect potential drug therapy problems.[34] Computer programs can be used to assist the pharmacist in identifying potential problems. It is up to the pharmacists' professional judgment, however, as to what action to take, which could

include contacting the prescriber.As part of the ProDUR, the following are areas for drug therapy problems that the pharmacist must screen:

- Therapeutic duplication
- Drug-disease contraindications
- Drug-drug interactions
- Incorrect drug dosage
- Incorrect duration of treatment
- Drug-allergy interactions
- Clinical abuse/misuse of medication

12. OBRA-90 also required states to establish standards governing patient counseling. In particular, pharmacists must offer to discuss the unique drug therapy regimen of each Medicaid recipient when filling prescriptions for them. Such discussions must include matters that are significant in the professional judgment of the pharmacist. The information that a pharmacist may discuss with a patient is found in Table 4.

13. Therefore, because the Confederate State of Virginia did not pass two laws concerning Medicaid and Cash Patients, which would be discrimination, the Confederate State must obey and enforce OBRA-90 Federal Law!

14. When this court reviews US Supreme Court Ruling, *Cooper v Aaron* (1958) which demanded that: 9. No state legislator or executive or judicial officer can war against the Constitution without violating his solemn oath to support it. P. 358 U. S. 18.

15. Does a Board Member of the Confederate State of Virginia swear an Oath to protect the Citizens of America in the Confederate State and swear to up hold the Constitution of the Untied States, You Bet!

16. By Federal Law, the Virginia Pharmacy Board of the Confederate State of Virginia has now waged war against the Constitution of the United States and must by LAW, be removed from their position.

6

[illegible] prescriptions [illegible] Protocol, the following [illegible] for [illegible]

[illegible]

- Therapeutic duplication
- Drug-disease contraindications
- Drug-drug interactions
- Incorrect drug dosage
- Incorrect duration of treatment
- Drug-allergy interactions
- Clinical abuse/misuse of medication

12. OBRA-90 also required states to establish standards governing patient counseling. In particular, pharmacists must offer to discuss the unique drug therapy regimen of each Medicaid recipient when filling prescriptions for them. Such discussions must include matters that are significant in the professional judgment of the pharmacist. The information that a pharmacist may discuss with a patient is found in Table 4.

13. Therefore, because the Confederate State of Virginia did not pass two laws concerning Medicaid and Cash Patients, which would be discrimination, the Confederate State must obey and enforce OBRA-90 Federal Law!

14. When the court reviews US Supreme Court Ruling, Cooper v Aaron (1958) which demanded that: 3. No state legislator or executive or judicial officer can war against the Constitution without violating his solemn oath to support it. P. 358 U. S. 18.

15. Does a Board Member of the Confederate State of Virginia swear an Oath to protect the Citizens of America in the Confederate State and swear to up hold the Constitution of the United States, You Bet!

16. By Federal Law, the Virginia Pharmacy Board of the Confederate State of Virginia has now waged war against the Constitution of the United States and must by LAW be removed from their position.

17. What relief did the Board of Pharmacy of the Confederate State provide the patient's, The Plaintiff's Civil Rights Violations, NOTHING!

18. If it pleases this court, please review the letter written to the Governor of VA, Ralph Northam who happens to be a physician, who was given notice to correct these defects and chose to ignore the warnings and continue The Confederate Ways and assaulting the citizens of Virgina.

19. Bodies in Motion, a physical therapy criminal organization in Falls Church, VA committed Insurance Fraud with open arms.  Knowing that no matter what complaint The Plaintiff was forwarded to the Physical Therapy Board, the Board would protect him.  Please see the letter AMY KAPLAN, Civil Rights Complaint 296778 directed to the Plaintiff.  This letter constitutions a Prima Facia Case agains the Confederate State of Virginia is guilty of violating the Civil Rights of The Plaintiff.  Every position that Kaplan takes in this letter is contrary to Federal Law!

20. Kaplan takes pain staking steps to ensure that Bodies in Motion is protected by the Confederate State.  Kaplan takes the position that Bodies In Motion position prevails and the patient's Civil Rights are ignored.

21. Please read the response by The Plaintiff to Kaplan's unconstitutional stance to protect the Constitutional Rights of the Plaintiff!  What do you think the Physical Therapy Board did to Bodies in Motion and Michael, "Little Mafia" Mastrostefano? Nothing, as of this day of preparation,  The Plaintiff has made numerous attempts to contact Karen Booke with little results.  Karen Booke, investigator has talked to me and can only state this is an on going investigation.

17. What relief did the Board of Pharmacy of the Confederate State provide the patient. The Plaintiff's Civil Rights Violations, NOTHING!

18. If it pleases this court, please review the letter written to the Governor of VA, Ralph Northam who happens to be a physician, who was given notice to correct these defects and chose to ignore the warnings and continue. The Confederate Ways and assaulting the citizens of Virginia

19. Bodies in Motion, a physical therapy criminal organization in Falls Church, VA committed Insurance Fraud with open arms, knowing that no matter what complaint The Plaintiff was forwarded to the Physical Therapy Board, the Board would protect him. Please see the letter AMY KAPLAN, Civil Rights Complaint 290778 directed to the Plaintiff. This letter constitutes a Prima Facia Case against the Confederate State of Virginia is guilty of violating the Civil Rights of The Plaintiff. Every position that Kaplan takes in this issue is contrary to Federal Law!

20. Kaplan takes pain staking steps to ensure that Bodies in Motion is protected by the Confederate State. Kaplan takes the position that Bodies in Motion position prevails and the patients Civil Rights are ignored.

21. Please read the response by The Plaintiff to Kaplan's unconstitutional stance to protect the Constitutional Rights of the Plaintiff. What do you think the Physical Therapy Board to Bodies in Motion and Monreal, "Little Mafia" Masquerading? Nothing, as of this day of preparation. The Plaintiff has made numerous attempts to contact Kaplan's books with little results. Karen Brooks, Investigator has failed to me and can only state this is an on going investigation.

7

22. Mr. Mastrostefano, aka "Little Mafia" business was billing AETNA with a CPT code of 9999. To remind this court, The Plaintiff is a Clinical Pharmacist and understands CPT codes without doubt questioned the billing clerk in front of 10 patients. The clerk not only discussed billing issues in front of many patients which is a violation of HIPPA, but she also continued mentioning the disease state of the patient, therapy received by the patient, which is also a HIPPA Violation.

23. The Plaintiff clearly announced that The Plaintiff called AETNA on January 10, 2018, and informed AETNA about CPT code 9999, Aetna never received the CPT code 9999 transmitted by Bodies in Motion to AETNA.

24. Bodies in Motions billing clerk clearly stated that AETNA rejected paying for the needles.

25. Bodies in Motion now billed the Plaintiff and his wife $7 per needle because AETNA does not pay for the needles. In Fact, Bodies in Motion on all bills to AETNA used CPT codes: 97140 - Manual Therapy 15 minutes, 97140 - Manual Therapy 15 minutes, 97139 - Therapeutic Proc 15 min, 97110 - Therapeutic Exercises 15 minutes, 97110 - Therapeutic Exercise 15 minutes. Please, this court take simple math, 5 x 15 = 75 minutes. Bodies in Motion billed for The Plaintiff and his wife the same. Both patients never stayed longer than 50 minutes for therapy. Therefore, 15 minutes therapy was fraudulent by definition.

26. No documentation from AETNA demonstrates that Bodies in Motion ever billed for needles or Dry Needling.

27. Numerous phone calls to AETNA received nebulous responses like, "The CPT code used is defined as Physical Therapy." AETNA constantly was ambiguous

8

22. Mr. Mastrosterano, aka "Little Italia" business was billing AETNA with a CPT code of 9898. To remind this court. The Plaintiff is a Clinical Pharmacist and understands CPT codes without doubt questioned the billing clerk in front of 10 patients. The clerk not only discussed billing issues in front of many patients which is a violation of HIPPA, but she also continued mentioning the disease state of the patient, therapy received by the patient which is also a HIPPA Violation.

23. The Plaintiff clearly announced that The Plaintiff called AETNA on January 10, 2018, and informed AETNA about CPT code 9898. Aetna never received the CPT code 9898 transmitted by Bodies in Motion to AETNA.

24. Bodies in Motions billing clerk clearly stated that AETNA rejected paying for the needles.

25. Bodies in Motion now billed the Plaintiff and his wife $7 per needle because AETNA does not pay for the needles. In Fact, Bodies in Motion on all bills to AETNA used CPT codes: 97140 - Manual Therapy 15 minutes, 97140 - Manuel Therapy 15 minutes, 97530 - Therapeutic Proc 15 min, 97110 - Therapeutic Exercises 15 minutes, 97110 - Therapeutic Exercise 15 minutes. Please, this court take simple math, 5 x 15 = 75 minutes. Bodies in Motion billed for The Plaintiff and his wife the same. Both patients never stayed longer than 30 minutes for therapy. Therefore, 15 minutes therapy was fraudulent by definition.

26. No documentation from AETNA demonstrates that Bodies in Motion ever billed for needles or Dry Needling.

27. Numerous phone calls to AETNA received ridiculous responses like, "The CPT code used is defined as Physical Therapy." AETNA constantly was ambiguous

which clearly violated ERISA which is the Federal Law that protects American from predatory actions of Insurance companies. Throughout this injunction, you will see a pattern of AETNA not only lying, deceiving the patients also just doing everything they can do not to pay a claim.

28. AETNA was notified on May 5, 2018, by The Plaintiff that fraud was being conducted by Bodies in Motion by time and NO billing for dry needling. ON MAY 8, 2018, AETNA investigate the allegations by the Plaintiff and ruled NO Fraud by Bodies in Motion and determined the correct billing, $88.48 per visit!

29. AETNA, SHILA on June 12, 2018, went over all billing for both Glenn Myer and Asmaa Allali-Myer and CLEARLY noted that there were NO billing for Dry Needling from Bodies in Motion to AETNA. However, reviewing the letter from Kaplan, who happens to be an RN, JD, which in the pharmacy world, means, Nurse Lawyer, Kaplan clearly notes that the bill for the needles were deducted from our bill so all is good in the world of OCR! Let me paint another picture, *man walks into a bank, presents a gun, robs the bank, waits a couple of days, thinks, "Oh, I was bad on this robbery!" Goes back to the Bank and gives the money back. Walks out and the FBI investigates the robbery and states, "Oh, he gave the money back, all good!"*

30. This is how SHILA from AETNA claims that Dry Needling should have been billed. CPT Code: 98941 is for ACUPUNCTURE 1 OR MORE NEEDLE, ***ALL SUPPLIES ARE PAID FOR!*** CPT Code: 20552 INJ;SINGLE/MX TRIG POINT INJECTION, ***ALL SUPPLIES ARE PAID FOR!*** Under both CPT codes, ALL SUPPLIES ARE PAID FOR! Where does Bodies in Motion come up with the fact that The Plaintiff's owe them $7 dollars per needle when they never billed AETNA for Dry Needling!

9

which clearly violated ERISA which is the Federal Law that protects American from predatory actions of insurance companies. Throughout this injunction, you will see a pattern of AETNA not only lying, deceiving the patients also just doing everything they can do not to pay a claim.

28. AETNA was notified on May 5, 2016, by The Plaintiff that fraud was being conducted by Bodies in Motion by time and NO billing for dry needling. ON MAY 5, 2016, AETNA investigate the allegations by the Plaintiff and ruled NO Fraud by Bodies in Motion and determined the correct billing, $88.48 per visit!

29. AETNA, SHILA on June 12, 2018, went over all billing for both Glenn Myer and Asmina Adib-Myer and CLEARLY noted that there were NO billing for Dry Needling from Bodies in Motion to AETNA. However, reviewing the letter from Kaplan, who happens to be an RN, J.D. which in the pharmacy world, means, Nurse Lawyer, Kaplan clearly notes that the bill for the needles were deducted from our bill so all is good in the world of OCRI! Let me paint another picture, man walks into a bank, presents a gun, robs the bank, waits a couple of days, thinks, "Oh I was bad on this robbery!" Goes back to the Bank and gives the money back. Walks out and the FBI investigates the robbery and states, "Oh, he gave the money back, all good!"

30. This is how SHILA from AETNA claims that Dry Needling should have been billed. CPT Code: 96544 is for ACUPUNCTURE 1 OR MORE NEEDLE, ALL SUPPLIES ARE PAID FOR! CPT Code: 20552 INJ SINGLE/MX TRIG POINT INJECTION, ALL SUPPLIES ARE PAID FOR! Under both CPT codes, ALL SUPPLIES ARE PAID FOR! Where does Bodies in Motion come up with the fact that The Plaintiffs owe them $7 dollars per needle when they never billed AETNA for Dry Needling!

31. PLEASE note that the Physical Therapy Board on Civil Rights Violations deemed the ACTIONS of Bodies in Motion to be professional and correct, no criminal or unprofessional conduct was concluded to the knowledge of The Plaintiff!

32. The Plaintiff's retort is clear enough the Kaplan lacks the knowledge to hold her position or perform her position as one to investigate fraud! What does the Physical Therapy Board does concerning Bodies in Motion, Karen Booke the investigator has not communicated any outcome on the investigation as of the day this complaint is being typed! Do we see a pattern here?

33. Does AETNA actually think they can get away with this type of what The Plaintiff believes is criminal action? Yes,! Let's look at ASMAA ALLALI-MYER's case of a Breast Reduction procedure proposed by Dr. Reza Mirali Akbari, a well established plastic surgeon sitting on FDA board member.

34. AETNA denied the first request and never notified the patient of the results as required by ERISA.

35. The documentation received by Dr. Mirali was woefully inadequate that really no proper medical information was communicated other than the amount of breast tissue being removed and not being medically necessary.

36. The Plaintiff requested full documentation concerning the denial and was refused. The Plaintiff than informed AETNA the a Federal Injunction would be filed requesting the documentation. AETNA furnished full disclosure.

37. The Plaintiff showed the documentation to the five doctors and all five stated they have never seen any documentation that looked any thing like The Plaintiff presented to them.

10

31. PLEASE note that the Physical Therapy Board on Civil Rights Violations deemed the ACTIONS of Bodies in Motion to be professional and correct, no criminal or unprofessional conduct was concluded to the knowledge of The Plaintiff.

32. The Plaintiff's relief is clear enough the Kaplan lacks the knowledge to hold her position or perform her position as one to investigate fraud! What does the Physical Therapy Board doe? concerning Bodies in Motion, Karen Booke the investigator has not communicated any outcome on the investigation as of the day this complaint is being typed. Do we see a pattern here?

33. Does AETNA actually think they can get away with this type of what The Plaintiff believes is criminal action? Yes!! Let's look at ASMAA ALLAH-MYERS case of a Breast Reduction procedure proposed by Dr. Reza Mirali Akbari, a well established plastic surgeon sitting on FDA board member.

34. AETNA denied the first request and never notified the patient of the results as required by ERISA.

35. The documentation received by Dr. Mirali was woefully inadequate that really no proper medical information was communicated other than the amount of breast tissue being removed and not being medically necessary.

36. The Plaintiff requested full documentation concerning the denial and was refused. The Plaintiff then informed AETNA the a Federal Injunction would be filed requesting the documentation. AETNA furnished full disclosure.

37. The Plaintiff showed the documentation to the five doctors and all five stated they have never seen any documentation that looked any thing like The Plaintiff presented to them.

38. The Plaintiff called AETNA and described the long history of Asmaa's back, neck and overall health due to enlarged breasts. Asmaa saw 5 physicians: Dr. Greg Fischer, Dr. Jay Cho, Dr. Ray Shabti, Dr. Reza Mirali, Dr. Mark Tekrony and all physicians came to the same conclusion that this procedure was deemed medically necessary.

39. On this case, please review the volumes of notes and documentation, AETNA is clearly violating ERISA. At NO time does AETNA ever communicate with the patients which is mandated in ERISA via standard care and fiduciary duty. ERISA's Congressional Findings and declaration of Policy clearly stipulates that:

Sec. 1001. Congressional findings and declaration of policy

(b) Protection of interstate commerce and beneficiaries by requiring disclosure and reporting, setting standards of conduct, etc., for fiduciaries It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

40. ERISA CLEARLY states that the Insurance companies must establish standards of conduct, responsibilities, and obligation for fiduciaries of employee benefit plans…. The evidence against AETNA will show a willful violations of most fiduciary duties that AETNA is charge to perform.

41. The Plaintiff has filed th appeal via Dr. Mirila and received the proper documentation which is provided and this appeal was denied on two basis: That over 600 g of breast tissue must be removed from each breast and the operation must be medically necessary. All FIVE physicians agreed that the operation was medically necessary. All five agreed that 600 g of breast tissue was insane.

11

38. The Plaintiff called AETNA and described the long history of Asmaa's back, neck and overall health due to enlarged breasts. Asmaa saw 5 physicians: Dr. Greg Fischer, Dr. Jay Cho, Dr. Ray Shabbi, Dr. Reza Mirali, Dr. Mark Talmony and all physicians came to the same conclusion that this procedure was deemed medically necessary.

39. On this case, please review the volumes of notes and documentation. AETNA is clearly violating ERISA. At NO time does AETNA ever communicate with the patients which is mandated in ERISA via standard care and fiduciary duty. ERISA's Congressional Findings and declaration of Policy clearly stipulates that:

Sec. 1001. Congressional findings and declaration of policy

(b) Protection of interstate commerce and beneficiaries by requiring disclosure and reporting, setting standards of conduct, etc., for fiduciaries It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

40. ERISA CLEARLY states that the insurance companies must establish standards of conduct, responsibilities, and obligations for fiduciaries of employee benefit plans. The evidence against AETNA will show a willful violations of most fiduciary duties that AETNA is charge to perform.

41. The Plaintiff has filed an appeal with DOL [illegible] and received the proper documentation which is provided and the appeal was denied on the basis. That every [illegible] breast tissue must be removed from each breast and the operation must be medically necessary. AETNA physicians [illegible] see that the operation was medically necessary. All five agreed that 500 g of breast tissue was meant

42.  AETNA does not provide any medically based facts to support in the procedure to reduce the size of Asmaa's Breasts other than a pre-tabulated chart that states this amount of tissue is a fact in all breast reduction procedures.

43.  ERISA also clearly states that the law does not define what these standards are, standard conduct that is for FEDERAL COURTS to determine.  That is why we are here in Federal Court.

44.  The Plaintiff has filled complaints to the Virginia Insurance Commission and Delaware Insurance Commission concerning the conduct of AETNA and both have unambiguous stated that they have no impact on what AETNA does, they are out of control, both recommended The Plaintiff take AETNA to Federal Court!

45.  On or about April 16, 2018, at 8:30am, The Plaintiff called Dr. Spetz the physician that denied the claim.  The Plaintiff introduced himself as Dr. Myer and wanted to know why Dr. Spetz denied the claim for breast reduction.  Dr. Spetz had no memory of ever reading the chart or making a decision, Dr. Spetz stated that she would investigate and get back to Dr. Myer.

46.  Dr. Spetz called back in a few hours and stated, "Yes, I found the chart and denied the breast reduction because it failed to qualify and the independent doctor agreed." Was that Dr. Conner?  "Yes,!" replied Dr. Spetz. "I am looking at your email chain and I am reading that Dr. Conner would not weigh in on the procedure because he never got any pictures."  Dr. Spetz than stated, "This conversation is not productive." Dr. Spetz hung up.

47.  Christopher, office scheduler for Dr. Mirila states on June 14, 2018, that the pending 2nd appeal is being process as of that date.

12

48. This pattern will show up in every denial of procedures that The Plaintiff requested for himself or his wife.

49. Prosperity Pharmacy in Manassas Virginia received a prescription from Dr. Greg Fischer for 5% Lidocaine 3% Diclofenac for 240 g on February 28, 2018. When the Plaintiff received the first prescription, The Plaintiff called Prosperity Pharmacy and inquired why only 60 g was dispensed. The Plaintiff informed the tech that due to the surface area needed to relieve pain, The Plaintiff required the 240 g.

50. The technician Keith stated that he would send a PA to Dr. Fischer to deal with the quantity.

51. This process went on for several months phone calls to Dr. Fischer, Prosperity Pharmacy and AETNA with no resolution.

52. On May 15, 2018, around 1pm The Plaintiff called Prosperity Pharmacy and spoke initially Salena and technician. Th Plaintiff requested to speak with the Pharmacist. Tony answer the phone and stated, "I will take care of your problem!" The Plaintiff asked Keith was a pharmacist, NO. But I will take care of you. The Plaintiff insisted if Keith did not have a RPh or Pharm D after his name he did not want to talk with him. "NO, I can take care of you. Your Lidocaine is being denied because it exceeds the 1.7g/24 hour maximum daily does." This is clearly practicing pharmacy without a pharmacy license.

53. The Plaintiff told him to get the hell off the phone that he is not a pharmacist and should not be counseling patients about the maximum daily does. Put a pharmacist on the phone!

13

54. Tony picks up and identifies himself as a pharmacist. The plaintiff requests his state license, Tony's reply was, "No, why do you want to know?" The plaintiff insisted that a reason does not have to be given by a patient, the pharmacist must give his license number. Tony would not relent. Tony would also refuse to counsel the patient on why the rejection happened and the actual concentration of the prescription.

55. The plaintiff asked him to hold he was going to add the Pharmacy Board. Mr. Sammy Johnson gets on the phone and instructs Tony that all he has to do is to display his license on the wall, he does not have to give his license number out to anyone over the phone.

56. Than The Plaintiff informs Mr. Johnson that Keith the Pharmacy Technician is counseling the patients and the Pharmacist Tony refused to counsel the patient on the rejection and the concentration of the prescription.

57. Mr. Johnson instructed Tony that he was not obligated to counsel the patient on a refill prescription, only on new prescriptions.

58. The Plaintiff told Mr. Johnson that he was a moron and should have nothing to do with pharmacy, Mr. Johnson was violating Federal Law. Mr Johnson interrupted the patient and informed him that he represents Virginia Board of Pharmacy not Federal Law! The Plaintiff clearly chastised Mr. Johnson for being ignorant of Federal Law always supersedes State Law and Mr. Johnson should never interrupting a patient. Since Mr. Johnson was an idiot and just violated Federal Law by directing a Pharmacist not to provide his license number after being requested by a patient and

14

then further violate Federal Law by instructing Tony not to counsel a patient is inexcusable and instructed him to hang up the phone.

59.  Please read the letter written to Mr. Johnson giving the Pharmacy Board 30 days to provide a written plan to educate The Plaintiff on how the Confederate State of Virginia will comply with federal law.

60.  Tony now declared that since the Pharmacy Board has instructed him not to give his license number and counsel he is stop communicating with the patient.  The Plaintiff requested the Pharmacy Manager must call him.  The Plaintiff also informed Tony that his actions were Unprofessional and he believe constitutes abandonment of patient care.

61.   AETNA is responsible for cutting the dispensing quantity from 240 g to 60 g.  Lets exam how AETNA comes up with this medically necessary quantity?

62.   On May 21, 2018, The Plaintiff called AETNA at 1-800-238-6279 and talked with Jena who informed The Plaintiff that the plan limitations were exceeded and The Plaintiff needs a Prior Authorization to get it to be paid for.  The Plaintiff informs Jena that Dr. Fischer has sent in a PA.  Jena states that the prescription is greater than the 1.7 g/day.  The Plaintiff asks her if she is a Pharmacist?  NO.  Please transfer The Plaintiff to a Pharmacist.

63.  Jena does state that she reads the plan does allow 360 a/month.  The Plaintiff against stresses that this conversation is clinical in nature, please transfer this phone to a pharmacist.

64.  The Plaintiff is transferred to Kevin.  Kevin states that the plan does not pay for this strength of Lidocaine.  The Plaintiff again asks Kevin if he is a pharmacist, NO, I am

15

an Sr. Resolution Specialist.  The 5% Lidocaine prescription exceeds the 1.7 g/day strength based on the manufacturer Hi-Tech 35 g package.  This is the reason why you are being rejected.

65.  The Plaintiff asks, "Who determines the strength?"  Kevin, "Our P&T Committee" and they state that the maximum dose you can get is 50 g/day.  Plaintiff, "Are you sure about the 50 g/day."  Kevin, "Yes".  Plaintiff, if yes is the answer, why are you rejecting 1.7 g/day?

66.  Oh, I am sorry, that is wrong.  Plaintiff again insists to be switched to a pharmacist.

67.  The Plaintiff is switched to Jay Shree, PharmD, Texas, license number 33690, wow, she gave me her license number just by me asking her for it!  Wake up Tony!

68.  After a brief recap, Jay confirms that NO employee at AETNA can talk about Maximum Allow Dose except a pharmacist.  No one should be talking about lidocaine 5% and its application except for a pharmacist.  The employees at AETNA are practicing Pharmacy without a Pharmacy license.  Since The Plaintiff lives in the Confederate State of Virginia, this becomes their problem to solve.  What do you think the enforcement division at the Virginia Board told The Plaintiff when he called, "This does not fall under our jurisdiction, call the Insurance Commission".  When did the Insurance Commission regulate Pharmacy?

69.  Dr. Shree agreed with Dr. Myer that NIH and FDA put the MAD at 20 g/day, not 1.7 g/day.  Dr. Shree could not come up with a scientific answer that either Clinical Pharmacist would understand.  Dr. Shree committed to Dr. Myer to follow up since could not answer the question.

16

70.  The Plaintiff is nominating Dr. Shree for the Confederate Virginia New Pharmacy Administration Committee.  She is honest!

71.  The call got disconnected.  The Plaintiff tried to call back and Chinquine stated for a fact the Pharmacy was closed at 5pm!  The Plaintiff called her a liar and wanted to talk with her supervisor.  Brandon, the supervisor, refuses to transfer the call to the pharmacy because it is closed.  The Plaintiff called him a liar and wanted his boss.  The Plaintiff demanded the direct phone number to the pharmacy.  Brandon stated he was not allow the patients to call the pharmacy!

72.  Do you think it is a violation to prevent a patient to call a pharmacy?  Hell Yes!!!

73.  Now, Brandon is determined to tell The Plaintiff that 4.5 g/kg is the proper does for Lidocaine and The Plaintiff can get up to 20 g.  The Plaintiff again warns Brandon that he is practicing Pharmacy without aAmazing license and he will be held responsible for this criminal action.

74.  Amazing!!!!  The phone number to the pharmacy is:  855-240-0535!  Guess what it was open!  The pharmacist stated that NIH and FDA allow 20 g/day and that equals 600g/month!  Oh My God!

75.  The Pharmacist directs The Plaintiff to call 800-872-3862 to file a complaint about the employees at AETNA practicing pharmacy without a license.  The Plaintiff called the number and the COMPLAINT DEPARTMENT DOES NOT TALK TO THE PATIENTS!  NO MATTER WHAT!

76.  AGAIN, The Plaintiff talks to the enforcement division, AMY, of the pharmacy board and again rebuffed the attempt to file a complaint, this is not our problem.

17

77.  On May 22, 2018, The Plaintiff called Jim Rutkowski, attorney for the Board and informed him the frustration The Plaintiff has had with the Pharmacy Board.  Mr. Rutkowski offered some advice to talk with Caroline Juran or email her to hopefully get the Board to act on this problem

78.  Did The Plaintiff mention that Caroline Juran is by far the only person on the Board that know the law?  Caroline also agreed that the law needed to revised and directed The Plaintiff to his lawmakers.

79.  On May 25, 2018, at approximately 11:00am The Plaintiff was arrested for embezzlement of $200 dollars of medical equipment that The Plaintiff offered Judge Anthony Trenga on May 15th in Alexandria, VA Federal Court House.

80.  The magistrate looked at the history of The Plaintiff given to him by Omar "The Butcher" Mercedes which the Magistrate looked at and revoked bail knowing that Memorial Day weekend, The Plaintiff could not be released until Tuesday!

81.  The Plaintiff was processed in the Fairfax Adult Detention Center where the first male nurse inquired if The Plaintiff had any mental illness?  The Plaintiff said, "Yes". What is your illness, Depressed, Suicidal, Anxious?  The Plaintiff, "No."  What is your illness, Cognitive Disfunction, due to Oral Squamous Cell Carcinoma where the lower left mandible was resected with a chisel and hammer for 10 hours?  The nurse said, "If you want to give me an attitude, I will put you in solitary."

82.  The Plaintiff stated that he had answered his question and also informed the nurse that The Plaintiff was a Clinical Pharmacist.  "You are in jail, all of your Dr.'s and qualifications go out the window when you are in jail!"

83.  The Plaintiff stated, "No problem, what answers do you want!"  What is your mental disease, "Cognitive Disfunction?"  Why didn't you just say that?

84.  The Plaintiff informed the nurse that he must have his Addrell as soon as possible.  The nurse ignored the request.  Several Fairfax Sheriff's were informed about the medical condition and refused to help The Plaintiff.

85.  The Plaintiff was taken up to the cell and informed the sheriff that he needed his Addrell by 4am.  The deputy sent The Plaintiff to the Medical Service where an African Nurse agreed that he must have the Addrell and told The Plaintiff that he would call the Doctor and make sure that The Plaintiff gets his medication.

86.  At some point, the deputy asked The Plaintiff to get up and go to the Medical Service to get his meds, The Plaintiff fell out of his bed because NO ADDRELL was given.

87.  The deputy told The. Plaintiff to get back into bed, the Nurse Manager came and put The Plaintiff in a wheel chair and informed The Plaintiff that Addrell is Forensic?  The Plaintiff stated that he did not know what, "Forensic" meant when it came to his medications.  The Plaintiff insisted on getting his medications.  The Nurse kept on berating The Plaintiff.  The Plaintiff asked the Nurse, who is higher on the food chain, a Clinical Pharmacist or a Nurse?  Clinical Pharmacist stated the nurse.  "Watch your next words carefully!"  Stated The Plaintiff.

88.  The Nurse stated that The Plaintiff is in jail and has no rights!  No Addrell, took him back to his cell and left him.

89.  The Plaintiff filled out a "Forensic Evaluation" which states an emergency mental evaluation is needed.  This was ignored.

19

90. Several Hours later, The Plaintiff was transferred to solitary confinement. No interaction with anyone, the sheriffs claim they check in on you every 10 minutes, that's bullshit.

91. Even with The Plaintiff not being in the right mind, that was not a true statement.

92. The Plaintiff requested that a "Forensic Evaluation" must be done, The sheriff gave him the form with no pen or pencil. Therefore, the form could not be filled out.

93. The Plaintiff fell out of his bed once.

94. The Plaintiff refused to take his medication. The Nurse Manager came into the cell and informed The Plaintiff that if he did not take his meds he would have a seizure. The Plaintiff informed the nurse that The Plaintiff was not an epileptic, the medication was being used as a neuroleptic. The nurse had no idea what neuroleptic meant.

95. Every time The Plaintiff was taken to the nurses, he asked for the Addrell and was refused. This went on for 3 and 1/2 day.

96. On Monday, May 28, 2018, the Doctor knew The Plaintiff and asked why are you in solitary confinement? "Oh, The nurse told me that you were an Addrell addict and was going through withdrawal, that was a lie," the Doctor said. You will get your Addrell immediately, you will be allowed to eat Halal, Fast and all other rights that Muslims get.

97. Tuesday Morning, The Plaintiff asked the deputy if he could go down to the Medical Service and get his meds so he can fast. Deputy Hood denied. The Plaintiff clearly communicated to the deputy that this was a violation of his First Amendment Right and the Nurses were not qualified to dispense The Plaintiff's medication properly.

20

98.  The deputy disagreed and walked away.

99.  The Plaintiff with an altered state of mind did not get his Adderall until 10:25 am on Tuesday and was released around 1pm.

100.  On Tuesday morning, The Plaintiff had a bail hearing, "Why was Mr. Myer denied bail?  Why was he incarcerated?  Who took away his bail?" Asked the judge.  The Judge released  The Plaintiff on Supervised Release Program, NO BAIL!

101.  The Plaintiff by the definition by international and US law does not have a universal civil remedy, but please review the Federal Law:

Torture (18 U.S.C. 2340A)

Section 2340A of Title 18, United States Code, prohibits torture committed by public officials under color of law against persons within the public official's custody or control. Torture is defined to include acts specifically intended to inflict severe physical or mental pain or suffering. (It does not include such pain or suffering incidental to lawful sanctions.) The statute applies only to acts of torture committed outside the United States. There is Federal extraterritorial jurisdiction over such acts whenever the perpetrator is a national of the United States or the alleged offender is found within the United States, irrespective of the nationality of the victim or the alleged offender.

102.  The Plaintiff reads this Statute and realizes that America only prohibits Torture outside of America?  Can torture happen in America?

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

## Adopted and opened for signature, ratification and accession by General Assembly resolution 39/46 of 10 December 1984 entry into force 26 June 1987, in accordance with article 27 (1)

The States Parties to this Convention,
Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,
Recognizing that those rights derive from the inherent dignity of the human person,
Considering the obligation of States under the Charter, in particular Article 55, to promote universal respect for, and observance of, human rights and fundamental

21

freedoms, Having regard to article 5 of the Universal Declaration of Human Rights and article 7 of the International Covenant on Civil and Political Rights, both of which provide that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment,

Having regard also to the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly on 9 December 1975,

Desiring to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world,

Have agreed as follows:

**PART I**

*Article 1*

1. For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

2. This article is without prejudice to any international instrument or national legislation which does or may contain provisions of wider application.

*Article 2*

1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.

2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.

3. An order from a superior officer or a public authority may not be invoked as a justification of torture.

*Article 3*

1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

*Article 4*

1. Each State Party shall ensure that all acts of torture are offences under its criminal law. The same shall apply to an attempt to commit torture and to an act by any person which constitutes complicity or participation in torture. 2. Each State Party shall make these offences punishable by appropriate penalties which take into account their grave nature.

*Article 5*

1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over the offences referred to in article 4 in the following cases:

(a) When the offences are committed in any territory under its jurisdiction or on board a ship or aircraft registered in that State;

(b) When the alleged offender is a national of that State;

(c) When the victim is a national of that State if that State considers it appropriate.

2. Each State Party shall likewise take such measures as may be necessary to establish its jurisdiction over such offences in cases where the alleged offender is

22

freedoms, Having regard to article 5 of the Universal Declaration of Human Rights and article 7 of the International Covenant on Civil and Political Rights, both of which provide that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment,

Having regard also to the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly on 9 December 1975,

Desiring to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world,

Have agreed as follows:

PART I

*Article 1*

1. For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

2. This article is without prejudice to any international instrument or national legislation which does or may contain provisions of wider application.

*Article 2*

1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.

2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.

3. An order from a superior officer or a public authority may not be invoked as a justification of torture.

*Article 3*

1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

*Article 4*

1. Each State Party shall ensure that all acts of torture are offences under its criminal law. The same shall apply to an attempt to commit torture and to an act by any person which constitutes complicity or participation in torture. 2. Each State Party shall make these offences punishable by appropriate penalties which take into account their grave nature.

*Article 5*

1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over the offences referred to in article 4 in the following cases:

(a) When the offences are committed in any territory under its jurisdiction or on board a ship or aircraft registered in that State;

(b) When the alleged offender is a national of that State;

(c) When the victim is a national of that State if that State considers it appropriate.

2. Each State Party shall likewise take such measures as may be necessary to establish its jurisdiction over such offences in cases where the alleged offender is

present in any territory under its jurisdiction and it does not extradite him pursuant to article 8 to any of the States mentioned in paragraph I of this article.

3. This Convention does not exclude any criminal jurisdiction exercised in accordance with internal law.

*Article 6*

1. Upon being satisfied, after an examination of information available to it, that the circumstances so warrant, any State Party in whose territory a person alleged to have committed any offence referred to in article 4 is present shall take him into custody or take other legal measures to ensure his presence. The custody and other legal measures shall be as provided in the law of that State but may be continued only for such time as is necessary to enable any criminal or extradition proceedings to be instituted.

2. Such State shall immediately make a preliminary inquiry into the facts.

3. Any person in custody pursuant to paragraph I of this article shall be assisted in communicating immediately with the nearest appropriate representative of the State of which he is a national, or, if he is a stateless person, with the representative of the State where he usually resides.

4. When a State, pursuant to this article, has taken a person into custody, it shall immediately notify the States referred to in article 5, paragraph 1, of the fact that such person is in custody and of the circumstances which warrant his detention. The State which makes the preliminary inquiry contemplated in paragraph 2 of this article shall promptly report its findings to the said States and shall indicate whether it intends to exercise jurisdiction.

*Article 7*

1. The State Party in the territory under whose jurisdiction a person alleged to have committed any offence referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution.

2. These authorities shall take their decision in the same manner as in the case of any ordinary offence of a serious nature under the law of that State. In the cases referred to in article 5, paragraph 2, the standards of evidence required for prosecution and conviction shall in no way be less stringent than those which apply in the cases referred to in article 5, paragraph 1.

3. Any person regarding whom proceedings are brought in connection with any of the offences referred to in article 4 shall be guaranteed fair treatment at all stages of the proceedings.

*Article 8*

1. The offences referred to in article 4 shall be deemed to be included as extraditable offences in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

2. If a State Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider this Convention as the legal basis for extradition in respect of such offences. Extradition shall be subject to the other conditions provided by the law of the requested State.

3. States Parties which do not make extradition conditional on the existence of a treaty shall recognize such offences as extraditable offences between themselves subject to the conditions provided by the law of the requested State.

4. Such offences shall be treated, for the purpose of extradition between States Parties, as if they had been committed not only in the place in which they occurred but also in the territories of the States required to establish their jurisdiction in accordance with article 5, paragraph 1.

*Article 9*

23

present in any territory under its jurisdiction and it does not extradite him pursuant to article 8 to any of the States mentioned in paragraph 1 of this article.

3. This Convention does not exclude any criminal jurisdiction exercised in accordance with internal law.

Article 6

1. Upon being satisfied, after an examination of information available to it, that the circumstances so warrant, any State Party in whose territory a person alleged to have committed any offence referred to in article 4 is present shall take him into custody or take other legal measures to ensure his presence. The custody and other legal measures shall be as provided in the law of that State but may be continued only for such time as is necessary to enable any criminal or extradition proceedings to be instituted.

2. Such State shall immediately make a preliminary inquiry into the facts.

3. Any person in custody pursuant to paragraph 1 of this article shall be assisted in communicating immediately with the nearest appropriate representative of the State of which he is a national, or, if he is a stateless person, with the representative of the State where he usually resides.

4. When a State, pursuant to this article, has taken a person into custody, it shall immediately notify the States referred to in article 5, paragraph 1, of the fact that such person is in custody and of the circumstances which warrant his detention. The State which makes the preliminary inquiry contemplated in paragraph 2 of this article shall promptly report its findings to the said States and shall indicate whether it intends to exercise jurisdiction.

Article 7

1. The State Party in the territory under whose jurisdiction a person alleged to have committed any offence referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution.

2. These authorities shall take their decision in the same manner as in the case of any ordinary offence of a serious nature under the law of that State. In the cases referred to in article 5, paragraph 2, the standards of evidence required for prosecution and conviction shall in no way be less stringent than those which apply in the cases referred to in article 5, paragraph 1.

3. Any person regarding whom proceedings are brought in connection with any of the offences referred to in article 4 shall be guaranteed fair treatment at all stages of the proceedings.

Article 8

1. The offences referred to in article 4 shall be deemed to be included as extraditable offences in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

2. If a State Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider this Convention as the legal basis for extradition in respect of such offences. Extradition shall be subject to the other conditions provided by the law of the requested State.

3. States Parties which do not make extradition conditional on the existence of a treaty shall recognize such offences as extraditable offences between themselves subject to the conditions provided by the law of the requested State.

4. Such offences shall be treated, for the purpose of extradition between States Parties, as if they had been committed not only in the place in which they occurred but also in the territories of the States required to establish their jurisdiction in accordance with article 5, paragraph 1.

Article 9

1. States Parties shall afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of any of the offences referred to in article 4, including the supply of all evidence at their disposal necessary for the proceedings.

2. States Parties shall carry out their obligations under paragraph I of this article in conformity with any treaties on mutual judicial assistance that may exist between them.

### Article 10

1. Each State Party shall ensure that education and information regarding the prohibition against torture are fully included in the training of law enforcement personnel,     civil or military, medical personnel, public officials and other persons who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention or imprisonment.

2. Each State Party shall include this prohibition in the rules or instructions issued in regard to the duties and functions of any such person.

### Article 11

Each State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.

### Article 12

Each State Party shall ensure that its competent authorities proceed to a prompt and impartial investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction.

### Article 13

Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given.

### Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.

### Article 15

Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made.

### Article 16

1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article I, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.

24

1. States Parties shall afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of any of the offences referred to in article 4, including the supply of all evidence at their disposal necessary for the proceedings.
2. States Parties shall carry out their obligations under paragraph 1 of this article in conformity with any treaties on mutual judicial assistance that may exist between them.

*Article 10*

1. Each State Party shall ensure that education and information regarding the prohibition against torture are fully included in the training of law enforcement personnel, civil or military, medical personnel, public officials and other persons who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention or imprisonment.
2. Each State Party shall include this prohibition in the rules or instructions issued in regard to the duties and functions of any such person.

*Article 11*

Each State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.

*Article 12*

Each State Party shall ensure that its competent authorities proceed to a prompt and impartial investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction.

*Article 13*

Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given.

*Article 14*

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.
2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.

*Article 15*

Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made.

*Article 16*

1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.

2. The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion.

**PART II**

*Article 17*

1. There shall be established a Committee against Torture (hereinafter referred to as the Committee) which shall carry out the functions hereinafter provided. The Committee shall consist of ten experts of high moral standing and recognized competence in the field of human rights, who shall serve in their personal capacity. The experts shall be elected by the States Parties, consideration being given to equitable geographical distribution and to the usefulness of the participation of some persons having legal experience.

2. The members of the Committee shall be elected by secret ballot from a list of persons nominated by States Parties. Each State Party may nominate one person from among its own nationals. States Parties shall bear in mind the usefulness of nominating persons who are also members of the Human Rights Committee established under the International Covenant on Civil and Political Rights and who are willing to serve on the Committee against Torture.

3. Elections of the members of the Committee shall be held at biennial meetings of States Parties convened by the Secretary-General of the United Nations. At those meetings, for which two thirds of the States Parties shall constitute a quorum, the persons elected to the Committee shall be those who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

4. The initial election shall be held no later than six months after the date of the entry into force of this Convention. At. least four months before the date of each election, the Secretary-General of the United Nations shall address a letter to the States Parties inviting them to submit their nominations within three months. The Secretary-General shall prepare a list in alphabetical order of all persons thus nominated, indicating the States Parties which have nominated them, and shall submit it to the States Parties.

5. The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. However, the term of five of the members elected at the first election shall expire at the end of two years; immediately after the first election the names of these five members shall be chosen by lot by the chairman of the meeting referred to in paragraph 3 of this article.

6. If a member of the Committee dies or resigns or for any other cause can no longer perform his Committee duties, the State Party which nominated him shall appoint another expert from among its nationals to serve for the remainder of his term, subject to the approval of the majority of the States Parties. The approval shall be considered given unless half or more of the States Parties respond negatively within six weeks after having been informed by the Secretary-General of the United Nations of the proposed appointment.

7. States Parties shall be responsible for the expenses of the members of the Committee while they are in performance of Committee duties.

*Article 18*

1. The Committee shall elect its officers for a term of two years. They may be re-elected.

2. The Committee shall establish its own rules of procedure, but these rules shall provide, inter alia, that:

(a) Six members shall constitute a quorum;

(b) Decisions of the Committee shall be made by a majority vote of the members present.

25

2. The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion.

PART II

Article 17

1. There shall be established a Committee against Torture (hereinafter referred to as the Committee) which shall carry out the functions hereinafter provided. The Committee shall consist of ten experts of high moral standing and recognized competence in the field of human rights, who shall serve in their personal capacity. The experts shall be elected by the States Parties, consideration being given to equitable geographical distribution and to the usefulness of the participation of some persons having legal experience.

2. The members of the Committee shall be elected by secret ballot from a list of persons nominated by States Parties. Each State Party may nominate one person from among its own nationals. States Parties shall bear in mind the usefulness of nominating persons who are also members of the Human Rights Committee established under the International Covenant on Civil and Political Rights and who are willing to serve on the Committee against Torture.

3. Elections of the members of the Committee shall be held at biennial meetings of States Parties convened by the Secretary-General of the United Nations. At those meetings, for which two thirds of the States Parties shall constitute a quorum, the persons elected to the Committee shall be those who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

4. The initial election shall be held no later than six months after the date of the entry into force of this Convention. At least four months before the date of each election, the Secretary-General of the United Nations shall address a letter to the States Parties inviting them to submit their nominations within three months. The Secretary-General shall prepare a list in alphabetical order of all persons thus nominated, indicating the States Parties which have nominated them, and shall submit it to the States Parties.

5. The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. However, the term of five of the members elected at the first election shall expire at the end of two years; immediately after the first election the names of these five members shall be chosen by lot by the chairman of the meeting referred to in paragraph 3 of this article.

6. If a member of the Committee dies or resigns or for any other cause can no longer perform his Committee duties, the State Party which nominated him shall appoint another expert from among its nationals to serve for the remainder of his term, subject to the approval of the majority of the States Parties. The approval shall be considered given unless half or more of the States Parties respond negatively within six weeks after having been informed by the Secretary-General of the United Nations of the proposed appointment.

7. States Parties shall be responsible for the expenses of the members of the Committee while they are in performance of Committee duties.

Article 18

1. The Committee shall elect its officers for a term of two years. They may be re-elected.

2. The Committee shall establish its own rules of procedure, but these rules shall provide, inter alia, that:

(a) Six members shall constitute a quorum;

(b) Decisions of the Committee shall be made by a majority vote of the members present.

3. The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under this Convention.

4. The Secretary-General of the United Nations shall convene the initial meeting of the Committee. After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.

5. The States Parties shall be responsible for expenses incurred in connection with the holding of meetings of the States Parties and of the Committee, including reimbursement to the United Nations for any expenses, such as the cost of staff and facilities, incurred by the United Nations pursuant to paragraph 3 of this article.

***Article 19***

1. The States Parties shall submit to the Committee, through the Secretary-General of the United Nations, reports on the measures they have taken to give effect to their undertakings under this Convention, within one year after the entry into force of the Convention for the State Party concerned. Thereafter the States Parties shall submit supplementary reports every four years on any new measures taken and such other reports as the Committee may request.

2. The Secretary-General of the United Nations shall transmit the reports to all States Parties.

3. Each report shall be considered by the Committee which may make such general comments on the report as it may consider appropriate and shall forward these to the State Party concerned. That State Party may respond with any observations it chooses to the Committee.

4. The Committee may, at its discretion, decide to include any comments made by it in accordance with paragraph 3 of this article, together with the observations thereon received from the State Party concerned, in its annual report made in accordance with article 24. If so requested by the State Party concerned, the Committee may also include a copy of the report submitted under paragraph I of this article.

***Article 20***

1. If the Committee receives reliable information which appears to it to contain well-founded indications that torture is being systematically practised in the territory of a State Party, the Committee shall invite that State Party to co-operate in the examination of the information and to this end to submit observations with regard to the information concerned.

2. Taking into account any observations which may have been submitted by the State Party concerned, as well as any other relevant information available to it, the Committee may, if it decides that this is warranted, designate one or more of its members to make a confidential inquiry and to report to the Committee urgently.

3. If an inquiry is made in accordance with paragraph 2 of this article, the Committee shall seek the co-operation of the State Party concerned. In agreement with that State Party, such an inquiry may include a visit to its territory.

4. After examining the findings of its member or members submitted in accordance with paragraph 2 of this article, the Commission shall transmit these findings to the State Party concerned together with any comments or suggestions which seem appropriate in view of the situation.

5. All the proceedings of the Committee referred to in paragraphs I to 4 of th is articles hall be con fidential , and at all stages of the proceedings the co-operation of the State Party shall be sought. After such proceedings have been completed with regard to an inquiry made in accordance with paragraph 2, the Committee may, after consultations with the State Party concerned, decide to include a summary account of the results of the proceedings in its annual report made in accordance with article 24.

***Article 21***

26

3. The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under this Convention.
4. The Secretary-General of the United Nations shall convene the initial meeting of the Committee. After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.
5. The States Parties shall be responsible for expenses incurred in connection with the holding of meetings of the States Parties and of the Committee, including reimbursement to the United Nations for any expenses, such as the cost of staff and facilities, incurred by the United Nations pursuant to paragraph 3 of this article.

Article 19

1. The States Parties shall submit to the Committee, through the Secretary-General of the United Nations, reports on the measures they have taken to give effect to their undertakings under this Convention, within one year after the entry into force of the Convention for the State Party concerned. Thereafter the States Parties shall submit supplementary reports every four years on any new measures taken and such other reports as the Committee may request.
2. The Secretary-General of the United Nations shall transmit the reports to all States Parties.
3. Each report shall be considered by the Committee which may make such general comments on the report as it may consider appropriate and shall forward these to the State Party concerned. That State Party may respond with any observations it chooses to the Committee.
4. The Committee may, at its discretion, decide to include any comments made by it in accordance with paragraph 3 of this article, together with the observations thereon received from the State Party concerned, in its annual report made in accordance with article 24. If so requested by the State Party concerned, the Committee may also include a copy of the report submitted under paragraph 1 of this article.

Article 20

1. If the Committee receives reliable information which appears to it to contain well-founded indications that torture is being systematically practised in the territory of a State Party, the Committee shall invite that State Party to co-operate in the examination of the information and to this end to submit observations with regard to the information concerned.
2. Taking into account any observations which may have been submitted by the State Party concerned, as well as any other relevant information available to it, the Committee may, if it decides that this is warranted, designate one or more of its members to make a confidential inquiry and to report to the Committee urgently.
3. If an inquiry is made in accordance with paragraph 2 of this article, the Committee shall seek the co-operation of the State Party concerned. In agreement with that State Party, such an inquiry may include a visit to its territory.
4. After examining the findings of its member or members submitted in accordance with paragraph 2 of this article, the Commission shall transmit these findings to the State Party concerned together with any comments or suggestions which seem appropriate in view of the situation.
5. All the proceedings of the Committee referred to in paragraphs 1 to 4 of this articles hall be confidential, and at all stages of the proceedings the co-operation of the State Party shall be sought. After such proceedings have been completed with regard to an inquiry made in accordance with paragraph 2, the Committee may, after consultations with the State Party concerned, decide to include a summary account of the results of the proceedings in its annual report made in accordance with article 24.

Article 21

1. A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under this Convention. Such communications may be received and considered according to the procedures laid down in this article only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be dealt with by the Committee under this article if it concerns a State Party which has not made such a declaration. Communications received under this article shall be dealt with in accordance with the following procedure;

(a) If a State Party considers that another State Party is not giving effect to the provisions of this Convention, it may, by written communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication the receiving State shall afford the State which sent the communication an explanation or any other statement in writing clarifying the matter, which should include, to the extent possible and pertinent, reference to domestic procedures and remedies taken, pending or available in the matter;

(b) If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to the other State;

(c) The Committee shall deal with a matter referred to it under this article only after it has ascertained that all domestic remedies have been invoked and exhausted in the matter, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective relief to the person who is the victim of the violation of this Convention;

(d) The Committee shall hold closed meetings when examining communications under this article; (e) Subject to the provisions of subparagraph

(e), the Committee shall make available its good offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for the obligations provided for in this Convention. For this purpose, the Committee may, when appropriate, set up an ad hoc conciliation commission;

(f) In any matter referred to it under this article, the Committee may call upon the States Parties concerned, referred to in subparagraph (b), to supply any relevant information;

(g) The States Parties concerned, referred to in subparagraph (b), shall have the right to be represented when the matter is being considered by the Committee and to make submissions orally and/or in writing;

(h) The Committee shall, within twelve months after the date of receipt of notice under subparagraph (b), submit a report: (i) If a solution within the terms of subparagraph (e) is reached, the Committee shall confine its report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of subparagraph (e) is not reached, the Committee shall confine its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report.

In every matter, the report shall be communicated to the States Parties concerned.

2. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the

27

1. A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under this Convention. Such communications may be received and considered according to the procedures laid down in this article only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be dealt with by the Committee under this article if it concerns a State Party which has not made such a declaration. Communications received under this article shall be dealt with in accordance with the following procedure;

(c) If a State Party considers that another State Party is not giving effect to the provisions of this Convention, it may, by written communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication the receiving State shall afford the State which sent the communication an explanation or any other statement in writing clarifying the matter, which should include, to the extent possible and pertinent, reference to domestic procedures and remedies taken, pending or available in the matter;

(b) If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to the other State;

(c) The Committee shall deal with a matter referred to it under this article only after it has ascertained that all domestic remedies have been invoked and exhausted in the matter, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective relief to the person who is the victim of the violation of this Convention;

(d) The Committee shall hold closed meetings when examining communications under this article; (e) Subject to the provisions of subparagraph

(c), the Committee shall make available its good offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for the obligations provided for in this Convention. For this purpose, the Committee may, when appropriate, set up an ad hoc conciliation commission;

(f) In any matter referred to it under this article, the Committee may call upon the States Parties concerned, referred to in subparagraph (b), to supply any relevant information;

(g) The States Parties concerned, referred to in subparagraph (b), shall have the right to be represented when the matter is being considered by the Committee and to make submissions orally and/or in writing;

(h) The Committee shall, within twelve months after the date of receipt of notice under subparagraph (b), submit a report: (i) If a solution within the terms of subparagraph (e) is reached, the Committee shall confine its report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of subparagraph (e) is not reached, the Committee shall confine its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report.

In every matter, the report shall be communicated to the States Parties concerned.

2. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the

subject of a communication already transmitted under this article; no further communication by any State Party shall be received under this article after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

*Article 22*

1. A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications from or on behalf of individuals subject to its jurisdiction who claim to be victims of a violation by a State Party of the provisions of the Convention. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration.

2. The Committee shall consider inadmissible any communication under this article which is anonymous or which it considers to be an abuse of the right of submission of such communications or to be incompatible with the provisions of this Convention.

3. Subject to the provisions of paragraph 2, the Committee shall bring any communications submitted to it under this article to the attention of the State Party to this Convention which has made a declaration under paragraph I and is alleged to be violating any provisions of the Convention. Within six months, the receiving State shall submit to the Committee written explanations or statements clarifying the matter and the remedy, if any, that may have been taken by that State.

4. The Committee shall consider communications received under this article in the light of all information made available to it by or on behalf of the individual and by the State Party concerned. 5. The Committee shall not consider any communications from an individual under this article unless it has ascertained that:

(a) The same matter has not been, and is not being, examined under another procedure of international investigation or settlement;

(b) The individual has exhausted all available domestic remedies; this shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective reliefto the person who is the victim of the violation of this Convention.

6. The Committee shall hold closed meetings when examining communications under this article.

7. The Committee shall forward its views to the State Party concerned and to the individual.

8. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already transmitted under this article; no further communication by or on behalf of an individual shall be received under this article after the notification of withdrawal of the declaration has been received by the SecretaryGeneral, unless the State Party has made a new declaration.

*Article 23*

The members of the Committee and of the ad hoc conciliation commissions which may be appointed under article 21, paragraph I (e), shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.

*Article 24*

The Committee shall submit an annual report on its activities under this Convention to the States Parties and to the General Assembly of the United Nations.

**PART III**

28

subject of a communication already transmitted under this article; no further communication by any State Party shall be received under this article after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

*Article 22*

1. A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications from or on behalf of individuals subject to its jurisdiction who claim to be victims of a violation by a State Party of the provisions of the Convention. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration.

2. The Committee shall consider inadmissible any communication under this article which is anonymous or which it considers to be an abuse of the right of submission of such communications or to be incompatible with the provisions of this Convention.

3. Subject to the provisions of paragraph 2, the Committee shall bring any communications submitted to it under this article to the attention of the State Party to this Convention which has made a declaration under paragraph 1 and is alleged to be violating any provisions of the Convention. Within six months, the receiving State shall submit to the Committee written explanations or statements clarifying the matter and the remedy, if any, that may have been taken by that State.

4. The Committee shall consider communications received under this article in the light of all information made available to it by or on behalf of the individual and by the State Party concerned. 5. The Committee shall not consider any communications from an individual under this article unless it has ascertained that:

(a) The same matter has not been, and is not being, examined under another procedure of international investigation or settlement;

(b) The individual has exhausted all available domestic remedies; this shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective relief to the person who is the victim of the violation of this Convention.

6. The Committee shall hold closed meetings when examining communications under this article.

7. The Committee shall forward its views to the State Party concerned and to the individual.

8. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already transmitted under this article; no further communication by or on behalf of an individual shall be received under this article after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party has made a new declaration.

*Article 23*

The members of the Committee and of the ad hoc conciliation commissions which may be appointed under article 21, paragraph 1 (e), shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.

*Article 24*

The Committee shall submit an annual report on its activities under this Convention to the States Parties and to the General Assembly of the United Nations.

**PART III**

*Article 25*
*1. This Convention is open for signature by all States. 2. This Convention is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.*
**Article 26**
This Convention is open to accession by all States. Accession shall be effected by the deposit of an instrument of accession with the SecretaryGeneral of the United Nations.
**Article 27**
1. This Convention shall enter into force on the thirtieth day after the date of the deposit with the Secretary-General of the United Nations of the twentieth instrument of ratification or accession.
2. For each State ratifying this Convention or acceding to it after the deposit of the twentieth instrument of ratification or accession, the Convention shall enter into force onthe thirtieth day after the date of the deposit of its own instrument of ratification or accession.
**Article 28**
1. Each State may, at the time of signature or ratification of this Convention or accession thereto, declare that it does not recognize the competence of the Committee provided for in article 20.
2. Any State Party having made a reservation in accordance with paragraph I of this article may, at any time, withdraw this reservation by notification to the Secretary-General of the United Nations.
**Article 29**
1 . Any State Party to this Convention may propose an amendment and file it with the Secretary-General of the United Nations. The SecretaryGeneral shall thereupon communicate the proposed amendment to the States Parties with a request that they notify him whether they favour a conference of States Parties for the purpose of considering an d voting upon the proposal. In the event that within four months from the date of such communication at least one third of the States Parties favours such a conference, the SecretaryGeneral shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of the States Parties present and voting at the conference shall be submitted by the Secretary-General to all the States Parties for acceptance.
2. An amendment adopted in accordance with paragraph I of this article shall enter into force when two thirds of the States Parties to this Convention have notified the Secretary-General of the United Nations that they have accepted it in accordance with their respective constitutional processes.         3. When amendments enter into force, they shall be binding on those States Parties which have accepted them, other States Parties still being bound by the provisions of this Convention and any earlier amendments which they have accepted.
**Article 30**
*1. Any dispute between two or more States Parties concerning the interpretation or application of this Convention which cannot be settled through negotiation shall, at the request of one of them, be submitted to arbitration. If within six months from thc date of the request for arbitration the Parties are unable to agree on the organization of the arbitration, any one of those Parties may refer the dispute to the International Court of Justice by request in conformity with the Statute of the Court.*
2. Each State may, at the time of signature or ratification of this Con vention or accession thereto, declare that it does not consider itself bound by paragraph I of this article. The other States Parties shall not be bound by paragraph I of this article with respect to any State Party having made such a reservation.

29

3. Any State Party having made a reservation in accordance with paragraph 2 of this article may at any time withdraw this reservation by notification to the Secretary-General of the United Nations.

*Article 31*

1. A State Party may denounce this Convention by written notification to the Secretary-General of the United Nations. Denunciation becomes effective one year after the date of receipt of- the notification by the Secretary-General .

2. Such a denunciation shall not have the effect of releasing the State Party from its obligations under this Convention in regard to any act or omission which occurs prior to the date at which the denunciation becomes effective, nor shall denunciation prejudice in any way the continued consideration of any matter which is already under consideration by the Committee prior to the date at which the denunciation becomes effective.

3. Following the date at which the denunciation of a State Party becomes effective, the Committee shall not commence consideration of any new matter regarding that State.

*Article 32*

The Secretary-General of the United Nations shall inform all States Members of the United Nations and all States which have signed this Convention or acceded to it of the following:

(a) Signatures, ratifications and accessions under articles 25 and 26;

(b) The date of entry into force of this Convention under article 27 and the date of the entry into force of any amendments under article 29;

(c) Denunciations under article 31.

*Article 33*

1. This Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

2. The Secretary-General of the United Nations shall transmit certified copies of this Convention to all States.

103. The Plaintiff copied the whole Act by The United Nations which binds the United States of America to enforce these provisions in the world. I anticipate and believe that the Defendants will plead that, "Oh, this treaty does not bind The Confederate State of Virginia to prevent torture." But in fact, it does. Please read the whole Act and you will read that each country must pass laws to protect the humanity of the signatures of each country.

104. The Plaintiff witnessed gross violations against multiple inmates that were heroin addicts on Suboxone being denied their lawful medication,

30

3. Any State Party having made a reservation in accordance with paragraph 2 of this article may at any time withdraw this reservation by notification to the Secretary-General of the United Nations.

*Article 31*

1. A State Party may denounce this Convention by written notification to the Secretary-General of the United Nations. Denunciation becomes effective one year after the date of receipt of the notification by the Secretary-General.
2. Such a denunciation shall not have the effect of releasing the State Party from its obligations under this Convention in regard to any act or omission which occurs prior to the date at which the denunciation becomes effective, nor shall denunciation prejudice in any way the continued consideration of any matter which is already under consideration by the Committee prior to the date at which the denunciation becomes effective.
3. Following the date at which the denunciation of a State Party becomes effective, the Committee shall not commence consideration of any new matter regarding that State.

*Article 32*

The Secretary-General of the United Nations shall inform all States Members of the United Nations and all States which have signed this Convention or acceded to it of the following:

(a) Signatures, ratifications and accessions under articles 25 and 26;
(b) The date of entry into force of this Convention under article 27 and the date of the entry into force of any amendments under article 29;
(c) Denunciations under article 31.

***Article 33***

1. This Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.
2. The Secretary-General of the United Nations shall transmit certified copies of this Convention to all States.

103. The Plaintiff copied the whole Act by The United Nations which binds the United States of America to enforce these provisions in the world. I anticipate and believe that the Defendants will plead that, "Oh, this treaty does not bind The Confederate State of Virginia to prevent torture." But in fact, it does. Please read the whole Act and you will read that each country must pass laws to protect the humanity of the signatures of each country.

104. The Plaintiff witnessed gross violations against multiple inmates that were heroin addicts on suboxone being denied their lawful medication,

also the nurses were depriving legend drugs that were also lawfully prescribed by patient-physician relationship.

105.  There are only two professions that can touch and inventory legend drugs, Registered Pharmacist and prescribing physicians.  A nurse legally can only remove legend drugs from a patient, Physicians and Pharmacist.

106.  Now, is The Plaintiff an expert witness in this field, Hell yes.  Is this court going to allow an inmate of the Adult Detention Center of Fairfax as an expert witness?

107.  Michael Lewis, Current Policy Registrant Policy Ass. Chief thought these actions were so vile that Loren Miller of the DEA number was given to the Plaintiff

108.  Loren Miller, Chief Compliance officer of the DEA felt so compelled by the events that Mr. Miller advised The Plaintiff to contact:  Virginia Pharmacy Board to immediately inspect the ADC, US Attorney's office to apprise them of the situation, Virginia State Attorney General Board Consumer Protection has authority over Hospitals.

109.  Mr. Miller could not find a DEA registration number for the ADC, but his ability may have been limited.

110.  Mr. Miller directed The Plaintiff to file complaints against the nurses at the ADC to the Virginia Nursing Board.

111.  Since The Plaintiff was in an incoherent state, The Plaintiff could not remember names or actions that were perpetrated against him.

31

also the nurses were depriving legend drugs that were also lawfully prescribed by patient-physician relationship.

105. There are only two professions that can touch and inventory legend drugs, Registered Pharmacists and prescribing physicians. A nurse legal can only remove legend drugs from a patient, Physicians and Pharmacists

106. Now, is The Plaintiff an expert witness in this field, Hell yes. Is this court going to allow an inmate of the Adult Detention Center of Fairfax as an expert witness?

107. Michael Lewis, Current Policy Registrant Policy Ass. Chief thought these actions were so vile that Loren Miller of the DEA number was given to the Plaintiff

108. Loren Miller, Chief Compliance officer of the DEA felt so compelled by the evidence that Mr Miller advised The Plaintiff to contact: Virginia Pharmacy Board to immediately inspect the ADC, US Attorney's office to apprise them of the situation, Virginia State Attorney General Board Consumer Protection has authority over Hospitals.

109. Mr Miller could not find a DEA registration number for the ADC, but his ability may have been limited.

110. Mr Miller directed The Plaintiff to file complaints against the nurses at the ADC to the Virginia Nursing Board.

111. Since The Plaintiff was in an incompetent state, The Plaintiff could not remember names or actions that were perpetrated against him.

112. When the Plaintiff tried to file complaints in the Pharmacy and Nursing Boards, the intake of the enforcement division would not take the complaints because The Plaintiff did not have the nurses names.

113. The Plaintiff attempted to get the pictures and names of the nurses that tortured him from ADC. One guess, yea, the arrogance and disregard that the nurses and staff at ADC demonstrated and subjected on The Plaintiff while illegally incarcerated is more demonstrative when The Plaintiff is outside of ADC.

114. When The Plaintiff requested the pictures and names, the nurse would asked why, The Plaintiff would educate the nurse, but when he would ask, "Could I please have the name of the African Nurses?" The nurse called The Plaintiff a racist and hung up on The Plaintiff.

115. I guess it is OK to torture a person in America, but if you ask if they are from Africa, being a racist (This is the only memory The Plaintiff has about the nurses, ALL OF THEM WERE AFRICAN) is worse!

116. When The Plaintiff requested his medical records from ADC, he was told NO! By whom, an African Nurse who would not give his name.

117. The Plaintiff spoke with Vera Giles, head of the Medical Services. Again, Amazing, someone in The Confederate State of Virginia who has a Brain! Vera actually agreed with The Plaintiff that HIPPA, a Federal Law must be adhered to by The Confederate State. My HPI must be given to the patient immediately!

112. When the Plaintiff tried to file complaints in the Pharmacy and Nursing Boards, the intake of the enforcement division would not take the complaints because The Plaintiff did not have the nurses names.

113. The Plaintiff attempted to get the pictures and names of the nurses that tortured him from ADC. One guess, yep, the arrogance and disregard that the nurses and staff at ADC demonstrated and subjected on The Plaintiff while illegally incarcerated is more demonstrative when The Plaintiff is outside of ADC.

114. When The Plaintiff requested the pictures and names, the nurse would asked why. The Plaintiff would educate the nurse, but when he would ask, "Could I please have the name of the African Nurses?" The nurse called The Plaintiff a racist and hung up on The Plaintiff.

115. I guess it is OK to torture a person in America, but if you ask if they are from Africa, being a racist (This is the only memory The Plaintiff has about the nurses, ALL OF THEM WERE WERE AFRICAN) is worse!

116. When The Plaintiff requested his medical records from ADC, he was told NO! By whom, an African Nurse who would not give his name.

117. The Plaintiff spoke with Vera Giles, head of the Medical Services. Again, Amazing, someone in The Confederate State of Virginia who has a Brain! Vera actually agreed with the Plaintiff that HIPPA, a Federal Law must be adhered to by The Confederate State. My text must be given to the patient immediately!

118. Susan from Medical Records call The Plaintiff and informed The Plaintiff that she had the copies of his Records and will give it to him once he provides a notarized statement who I am requesting medical records and pay the fee. Susan must have migrated to The Confederate State from the North!

119. The Nursing and Pharmacy Boards by this date, still have not contacted The Plaintiff informing him that the ADC has been inspected or any measure has been taken to protect the Constitutional Rights of the inmates or American Citizens in The Confederate State of Virginia.

## ANALYSIS

120. I know that this court is accustomed to reading legal headings, but is this really a legal brief or a plea for proper medical treatment for American Citizens?

121. The basic Clinical Analysis of this case is simple. The Confederate State of Virginia is waging war against the Untied States of America in every sense of the word. What is the Untied States of America doing about this civil war? Nothing! What is the Untied States of America doing to make sure the American Citizens living in the Rebel State are getting proper medical services, Nothing!

122. The honest police of The Confederate State truly understand who runs The Confederate State and it is not the law. The Judges run The

33

Confederate State!  The judges have a long earned reputation of violating the rights of the citizens.  The judges are the only ones that can ignore law, allow the police to violate the rights of the citizens, allow the administrative Boards to protect the MONEY of The Confederate State and violate the Constitutional Rights of the American Citizens living in Virginia.

123.  Does America have a long consummated reputation violating the Constitutional Rights of American?  The American Indian?  The Japanese American Interment Camps (Concentration Camps) during world war II?  The African American from day one?  The Poor?  The uneducated?  I think this list can go on and on.

124.  The Bright Spot about America is The Constitution of the United States.  America is the only country in the world when The Constitution is actually enforced America has justice and the law works.  When Judges are truly Judges, when courts actually rule on the law and not their criminal acts, When the Supreme Court does their job and up hold the Constitution instead of acting as a political pawn and slave to the president that appointed them, than American is the beacon of Justice in the world.

125.  The wheels of Justice move at a snail or two-toed sloth pace in America, but this war must be crushed.  The Confederate State of Virginia must be invaded by this court and dismantled and only allowed to function as a State of American not by reciting an "Oath" which The Rebel

34

Confederate State. The judges have a long earned reputation of violating the rights of the citizens. The judges are the only ones that can ignore law, allow the police to violate the rights of the citizens, allow the administrative Boards to protect the MONEY of The Confederate State and violate the Constitutional Rights of the American Citizens living in Virginia.

123. Does America have a long contaminated reputation violating the Constitutional Rights of Americans? The American Indians? The Japanese American Internment Camps (Concentration Camps) during world war II? The African Americans from day one? The Poor? The uneducated? I think this list can go on and on.

124. The Bright Spot about America is The Constitution of the United States. America is the only country in the world when The Constitution is actually enforced America has justice and the law works. When judges are truly Judges, when courts actually rule on the law and not their criminal acts, When the Supreme Court does their job and up hold the Constitution instead of acting as a political pawn and slave to the president that appointed them, than American is the beacon of Justice in the world.

125. The wheels of Justice move at a snail or two-toed sloth pace in America, but this war must be crushed. The Confederate State of Virginia must be invaded by this court and dismantled and only allowed to function as a State of American not by holding an "Oath" which The Rebel

State has already done, but proves over a long period of time that Virginia will obey and enforce The Constitution of the Untied States of America!

126. There is no way AETNA should be allowed to be owned by CVS, a pharmacy chain that now owns the bank. This topic is not relevant to this injunction, but it is extremely relative for the injunction.

127. AETNA has also waged war against the Untied States of America and this Court needs to put down the resurrection.

# **PRAYER RELIEF**

WHEREFORE, The Plaintiff now demands the immediate dissolution of the Administrative Boards of: Pharmacy, Nursing and Physical Therapy by this Court! The Plaintiff also realizes that this would immediately inject CHAOS! Did *Brown v Board of Education,* create Chaos? Did the Civil Rights Acts case Chaos? The Plaintiff also demands that the FDA or NIH appoint qualified Medical Personal that have NO Connection to The Confederate State of Virginia to oversee the administration of the regulation of these profession. The Confederate State of Virginia has now proven that their war against The Untied States is still actively engaged and must be crushed by The Untied States of America. The executive branch of The American Government is TOO intermingled with the Virginians and will not intervene to protect the Constitutional Rights of Americans. This Court is the last chance for JUSTICE to be enforced in The Confederate State of Virginia to protect Americans!

35

State has already done, but proves over a long period of time that Virginia will obey and enforce The Constitution of the United States of America!

126. There is no way AETNA should be allowed to be owned by CVS, a pharmacy chain that now owns the bank. This topic is not relevant to this injunction, but it is extremely relative for the injunction.

127. AETNA has also waged war against the United States of America and this Court needs to put down the resurrection.

## PRAYER RELIEF

WHEREFORE, The Plaintiff now demands the immediate dissolution of the Administrative Boards of: Pharmacy, Nursing and Physical Therapy by this Court. The Plaintiff also realizes that this would immediately inject CHAOS! Did Brown v Board of Education create Chaos? Did the Civil Rights Acts case Chaos? The Plaintiff also demands that the FDA or NIH appoint qualified Medical Personnel that have NO Connection to The Confederate State of Virginia to oversee the administration of the regulation of these profession. The Confederate State of Virginia has now proven that their war against The United States is still actively engaged and must be crushed by The United States of America. The executive branch of The American Government is TOO intermingled with the Virginians and will not intervene to protect the Constitutional Rights of Americans. This Court is the last chance for JUSTICE to be enforced in The Confederate State of Virginia to protect Americans.

The Plaintiff also requests that this Court takes over the administration of the health plan for the Plaintiff and his wife.  The Plaintiff has not disclosed to this court his dealings with AETNA concerning his cancer treatment.  Needless to say, it is the same as his wife.

Respectively Submitted to this Court with great firmness and determination by The Plaintiff!

_____

Glenn Myer, Clinical Pharmacist                    June 15, 2018
2251 Pimmit Dr. #732
Falls Church, VA 22043

36

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
_____ DIVISION

_Glenn Miller_
Plaintiff(s),

v.

_Ralph Northam_
Defendant(s).

Civil Action Number: _1·18-CV-723_

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of _Complaint : Injunction_
(Title of Document)

_Glenn Miller_
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _June 15, 18_ (Date)

**OR**

The following attorney(s) prepared or assisted me in preparation of _____.
(Title of Document)

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)